PATTERSON VS. FOWLER'S EXR.

Without attempting to deduce, from the authorities, any general and fixed rule, to be applied in all cases, as to what delay of the execution creditor to sue out process to enforce a levy upon land by a sale, will displace the lien, and let in intervening incumbrances, it is sufficient to decide, upon the facts of this case—the judgment lien being lost by lapse of time—that, by a delay of nearly four years between the return of the execution, under which the lands were levied on, and suing out the execution under which the lands were sold, during all which time no step was taken to enforce the levy, and no excuse given for the delay, the lien of the levy is displaced, as against the intervening rights of a more diligent creditor.

To allow a new case to be made by an amended bill—setting up a new and distinct title from that alleged and relied on in the original bill—after the parties had been litigating for more than eight years upon another title, and after the cause was at issue and set for hearing, would be extending the privilege of amendments beyond what is warranted by the established rules of pleading and practice, and setting a precedent that might result in much mischief.

*Appeal from Independence Circuit Court in Chancery.*

Hon. WILLIAM C. BEVENS, Circuit Judge.

FAIRCHILD, for appellant.

Whether Fowler's or Patterson's purchase shall hold the property, is a question of mere legal priority. Any right that Fowler acquired at the marshal's sale of 25th January, 1847, was a legal right, and the same remark is to be made of the sheriff's sale to Patterson. Not Fowler, nor his assignee, Bertrand, has any equity that can make his title any stronger in this court, than it would be in a court at law, in an action of ejectment.

The judgment in the federal court upon which the bill relies, was rendered the 10th August, 1840, an execution issued upon the 26th of the same month; another execution issued upon the

4th of February, 1843, under which the levy was made 20th of March ensuing; then a *venditioni exponas* was run upon the 7th of December, 1846, under which the sale of 26th January, 1847, was made.

That is the whole case made by the original bill.

The judgment, not being alleged to have been revived by *scire facias*, was a lien upon the lands in controversy, for three years and no more. *Trapnall vs. Richardson*, 13 *Ark.*, 543; *Pettit vs. Johnson*, 15 *Ark.*, 59; *Slocomb vs. Blackburn*, 18 *Ark.*, 315. And although the levy was made within three years from the time judgment was given, the judgment lien was not thereby prolonged beyond its statutory term of three years. *Trapnall vs. Richardson*, 13 *Ark.*, 552–557; *Pettit vs. Johnson*, 15 *Ark.*, 59; *Lawson vs. Jordan*, 19 *Ark.*, 303. The levy was made upon the 20th of March, 1843, and then a specific lien, but an execution lien, attached to the lands in controversy, and the question here to be decided is, how long shall that lien be held superior to the other after accruing liens, and without any attempt to enforce it by subsequent process? Here, then, arises the precise question with regard to an execution lien that this court put in *Trapnall vs. Richardson*, 13 *Ark.*, 553, respecting a judgment lien, where it says, " though the enquiry would arise, if the levy on " land has the same effect thus to continue the lien, how long will " the plaintiff have, after the expiration of his judgment lien, to " enforce a dormant levy by sale under execution, and make it " relate back to and connect with the lien."

This court, in the *State Bank vs. Etter*, 15 *Ark.*, 274, held that, our statute being silent with regard to the continuance of execution liens, " the court must necessarily determine, from delay " and other circumstances, whether the lien has been waived or " abandoned." And in that case a delay of two years and a half after the levy, with the other circumstances of the case, was adjudged to displace the lien, as against rights that were afterwards acquired. See *Slocomb vs. Blackburn*, 18 *Ark.*, 315.

An execution is not more potent to bind property, than the judgment on which it is founded, except it be made so by law;

no good reason can be adduced to maintain that the lien of a levy should have longer life than a judgment lien. In the last reported decision of this court upon this subject, it is expressly decided, that a sale that is not upheld by a lien, so as to carry the title back to the judgment, only gives title from the date of the execution coming to the hands of the officer, notwithstanding a previous levy. And it provides exactly for Patterson, in saying, that "in such case, a junior judgment with the lien would have priority over one without, but of older date." *Lawson vs. Johnson*, 19 *Ark.* 303.

From authority, and from reason, the necessary conclusion is, that before the issuance of the *venditioni exponas* of 7th December, 1846, the lien of the levy of 20th March, 1843, had been discharged, so as to let in intervening liens.

The amended bill cannot be sustained, because it presents a new, a different case from that presented in the original bill. Such is not the office of an amendment. It may correct imperfect statements in the original bill, by stating its allegations in another form, so as better to meet the case that is to be established by testimony, or to obtain discovery from a defendant more satisfactorily; may withdraw admissions; perhaps may contradict what are alleged as facts in the original bill; may make new allegations tending to support the claim already made; may prefer a case, so that counting it and the original bill as one, that one may have a double aspect, the alternative relief, to be consistent with and founded upon the whole case so made up, and not inconsistent with the object and scope of the original bill; may make new parties; and generally may allege whatever is necessary for a full enquiry into the facts pertaining to the support of the plantiff's claim, and into those relied upon to defend against it; but all amendments must result, or must aim to result, in maintaining or modifying the very case of the original bill, and cannot be the foundation on which to build an entirely different case. *Story's Eq. Pl.* 884; *Lube's Eq. Pl.* 87, *note*; *Dodd vs. Astor*, 2 *Barb. Ch. R.* 395;

*Crery vs. Beaven,* 13 *Sim.* 354 ; *Walford vs. Pemburton, ib.* 76; *Lyon vs. Talmadge,* 1 *John ch.* 188.

But if the subject matter of the amendment was proper for an amended bill at a proper stage of the case, this amended bill should not have been filed after the case was at issue and set for hearing, and therefore was illegally filed.

In the English practice, and so it was in New York, an amended bill may be filed until witnesses have been examined or proofs taken. But in that practice evidence is taken and publication of it passed, before the case is for hearing. *Dan. Ch. Pr. Ch. XXI, Eng. Ed. p.* 602, 603. This is after the issues are formed; and generally, the proper time for amendment is before replication. *Story Eq. Pl. sec.* 886 ; 1 *Hoff. Ch. Pr.* 284 ; *Lube's Eq. Pl.* 189.

Under our practice the cause stands for trial at the next term after it is at issue, that is after replication is filed; and the proper rule is, without regard to witnesses having been examined, that an amended bill can be filed, only before the case is at issue.

I have not been able to find in the books of practice, or in the reports, an instance of amendments being allowed to be made to a bill after replication, without the replication being withdrawn. And to obtain the leave, the party should also show good reason why the amendment was not made before replication was filed, or issue formed. *Story Eq. Pl. sec.* 887; 1 *Hoff. Ch. Pr.* 274, 286 ; *Colelouyh vs. Evans,* 4 *Simons,* 76 ; *Thorn vs. Germond,* 4 *Jhs. Ch.* 363 ; *Lube Eq. Pl.* 89.

STILLWELL & WOODRUFF, for appellee.

The *fi. fa.,* under which Fowler acquired the title set up in the original bill, issued and was levied while the lien of the judgment was alive : and the sale was on the 25th January, 1847, under a *ven. ex.* issued in December, 1846 ; hence there was a *continuous* lien upon the land from the date of the judgment till the date of the sale ; and the title was, doubtless, good against Stone, and also against Patterson, unless the delay to

sue out the *ven. ex.* displaced the lien of the levy, and let in the lien of Miller's judgment, rendered in 1845.

As to what will amount to a waiver or abandonment of a levy, there is a conflict of authority; but it will not be presumed from mere delay to sue out process to enforce the lien. 15 *Ark. R.* 90, 273. In *State Bank vs. Etter,* (15 *Ark.* 274), the circumstances from which an abandonment might be inferred, were very strong; and the decision was not based upon the neglect of the plaintiff to sue out his *ven. ex.*; but upon other circumstances, such as the failure to revive the judgment after the death of the defendant, etc. The delay to enforce the lien on chattels, where they are permitted to remain in the debtor's hands, is treated as a fraud upon the rights of other creditors; but a levy on land is a different thing—the existence of the lien is evidenced by the record. Here the delay is the only circumstance, and from it alone an abandonment of the levy cannot be presumed in favor of the junior judgment creditor, or one claiming under him, when he had full notice of the lien.

The levy of the *fi. fa.* was a specific lien on the land, and the *ven. ex.* was a mere continuation and completion of the *fi. fa.* 13 *Sm. & Mar.* 140; 13 *How. U. S. R.* 290; *Bald. C. C. R.* 276, in note; 1 *Watts* 42; 15 *Ark.* 59. And it can only be displaced by gross negligence. 1 *Watts* 301; 2 *McMullan Rep.* 351. And being *|specific and not general,* the residue of Stone's estate was subject to Miller's judgment.

But it is not at all requisite that we should argue in support of this title. The title set up in the amended bill is undoubtedly superior to Patterson's. But it is objected that the amended bill sets up a new title—makes a distinct and different case from the original bill. Now, if the amended bill had alleged that the title to the land in controversy was not as supposed in the original bill, at the time of Fowler's purchase in January, 1847, but was in some other person, and Bertrand had acquired that title, there would be a new title and different case from that made by the original bill. But such is not the fact. The title of Stone is the only one before the court, and

the question is, which of the parties acquired that title. Both sales to Fowler were under the same judgment—the inception of Fowler's rights under both deeds was the same, and together they formed one title.

In general, a supplemental bill will not be permitted to be filed except upon new matter; and if brought for matter arising before the filing of the original bill, a demurrer will lie. (*Story's Eq. Pl.*, *secs.* 614, 616). An amended bill is proper for " enquiry into additional facts, (*sec.* 884); or where he has omitted to state any matter which ought to have been stated in the original bill," (*sec.* 885).

Here the sale and purchase, set up in the amended bill, occurred before the filing of the original bill, and nothing remained to be done but the mere formality of procuring a deed. The marshal's deed when executed, related back to the sale, and the title is regarded as commencing then. 13 *J. C. R.* 316 ; 9 *Sm. & Mar.* 392 ; 1 *Gil. Rep.* 218.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

Taking up the questions deemed material to a disposal of the cause, in the order in which they have been discussed by counsel, we shall first determine whether the title of Absalom Fowler, to the lands in controversy, as set up in the original bill, is superior to that of James H. Patterson, as made out in his answer and cross-bill, he being the only party who appealed from the decree of the court below in favor of Fowler.

The substance of the case made by the original bill, is, that Rufus Stone was the owner of an undivided half of certain lands situated in Jackson county, which are described. That on the 10th of August, 1840, Hiram Stewart obtained a judgment against Stone in the Circuit Court of the United States for the District of Arkansas ; and on the 26th of the same month a *fi. fa.* was issued upon the judgment, and afterwards returned unsatisfied.

That on the 4th of February, 1843, another execution was issued, directed to the Marshal of the District, returnable on

the second day of the March term following; which, on the 6th of February, 1843, came to the hands of Thomas W. Newton, the marshal, and was by him levied upon the interest of Stone in the lands in controversy, on the 20th of the ensuing March, but returned without sale, for want of time to advertise and sell before the return day of the writ.

That on the 7th of December, 1846, the judgment and execution remaining unsatisfied, and the land unsold, to compel a sale thereof, a *venditioni exponas* was issued: which, on the same day, came to the hands of Elias Rector, then marshal, etc., who, on the 25th of January, 1847, after due advertisement, offered the lands for sale, at the court-house, in the county of Jackson, and Fowler purchased the interest of Stone therein at $1 per tract; and, on the 7th of May following, the marshal executed to him a deed therefor; which, upon the 17th of the same month, was duly recorded, etc.

It was alleged that Patterson claimed title to the same interest in the lands purchased by Fowler, and he was made defendant. Stone and others were, also, made defendants, but none of them appealed, and the pleadings relating to them, and to their claims to the lands, need not be stated here.

The bill prayed for partition of the lands, and for confirmation of Fowler's title.

Patterson, in his answer and cross-bill, alleges irregularities in the sale to Fowler, and sets up his own title, in substance, as follows:

On the 18th November, 1845, Henry Miller obtained a judgment against Rufus Stone, in the Circuit Court of Jackson county; on which a *fi. fa.* was issued 23d November, 1846, and on the same day placed in the hands of the sheriff of the county; who, on the 1st of December following, levied on the lands in controversy, and after due advertisement, offered them for sale, at the court-house door of said county, on the 17th May, 1847, and Patterson purchased them, and on the next day received the sheriff's deed therefor, conveying to him the inte-

30

rest of Stone in the lands, etc.; which deed was duly acknowledged and recorded 17th May, 1849. Prayer that Fowler's title be canceled, and Patterson's confirmed, etc.

The lien of the judgment under which Fowler purchased, commenced on the 10th of August, 1840, (the date of the judgment), and expired with the 10th of August, 1843, the duration of the lien being limited by the statute to three years from the date of the judgment.

The *alias fi. fa.* of 4th February, 1843, was issued, placed in the hands of the marshal and levied upon the lands before the lien of the judgment expired, but the lien was not thereby prolonged. *Trapnall vs. Richardson et al.*, 13 *Ark.* 549; *Pettit et al. vs. Johnson et al.*, 15 *Ib.* 59.

The execution became a general lien upon all the lands of Stone, within the territorial district of the court from which it issued, at the time it came to the hands of the marshal (6th February, 1843,)—*Trapnall vs. Richardson et al., ubi. sup.*—and became a specific lien upon the lands in controversy at the time it was levied upon them (20th March, 1843). The lien of the execution must be considered as disconnected with the judgment lien, which was lost to Fowler by lapse of time. (*Pettit et al. vs. Johnson et al.*, 15 *Ark.* 59.) If his title is superior to Patterson's, it must be because the lien of the execution was not only prior to the lien of the judgment under which Patterson purchased the lands, but continued unbroken to the time of the sale to Fowler, under the *vend. ex.*, on the 25th January, 1847.

The execution under which the levy was made, was returned, with the levy endorsed, without sale of the lands, for want of time, etc., to the March term, 1843. The *vend. ex.*, under which Fowler purchased, was issued and placed in the hands of the marshal on the 7th of December, 1846, a period of three years and about eight months from the time the execution was returned, during all which period it does not appear, from the allegations of the original bill, that the plaintiff in the execution (or Fowler, who was his attorney,) caused any interme-

diate process to be issued, to keep up the continuity of the levy, or enforce the lien. Did the execution lien continue in full force during all this period, or did it expire by reason of the laches of the plaintiff, so as to let in the lien of the judgment recovered by Miller against Stone in the meantime, under which Patterson purchased the lands?

It has been decided that the lien of a judgment is continued by the statute for three years, and that mere delay of the plaintiff to sue out process to enforce the lien, does not displace it, and let in junior incumbrances. *Trapnall vs. Richardson et al.*, 13 *Ark.* 551; *Watkins vs. Wassell*, 15 *Ib.* 90; *Shall ad. et al. vs. Biscoe et al.*, 18 *Ib.* 156.

The statute fixes the time when the execution lien shall commence, but does not declare how long it shall continue. *Dig.*, chap. 68, sec. 35.

In *State Bank vs. Etter*, 15 *Ark.* 273, the court said: " Judgment liens are by statute limited to three years, and we have held that mere delay to sue out process for satisfaction within that time, will not displace the lien; but here, where there is no limitation by statute, unless a different rule be applied to execution liens, they might remain an incumbrance upon the estate until the right to satisfaction of the judgment is barred by limitation."

In *Trapnall vs. Richardson et al.*, 13 *Ark.* 555, the court said: " It is obviously the policy of our system of laws to make the title to land depend upon matter of record, and not upon any act *in pais*, or resting in parol. The registry system is almost universal. Deeds, mortgages, mechanics' liens, settlements of separate estate in the wife, and all incumbrances affecting the title to the land, are required to be recorded in the county where the land lies, else they will not avail as against innocent purchasers. So, judgments and decrees are required to be condensed into a judgment docket, to facilitate the examination of incumbrances, and open to the inspection of all persons interested in the title to land. The only exceptions are, where the execution is levied on land to which the lien of the judg-

ment does not extend, *i. e.*, where the execution is sent to another county, or where the lien has been determined, *i. e.*, expired without revival, and, in such case, the execution is the lien from the time it comes to the officer's hands, just as it is on personal property, which is never barred by the lien of the judgment (*Rev. Stat., title Execution, sec.* 27), *and would probably have to be governed by the same rules as apply to personal property:* and clearly that the sale of land so situated would not be upheld by the lien of the judgment."

In *Slocomb et al. vs. Blackburn et al.*, 18 *Ark.* 315, the execution was levied on slaves, a delivery bond given, returned forfeited, and no process sued out for more than five years, and the question being whether the lien of the levy was lost by delay, etc., the court said:

" The act of 20th March, 1839, (*Dig. ch.* 67, *sec.* 38,) provides that ' if the property be not delivered according to the condition of the bond, *the levy shall remain a lien upon the property taken*, for the satisfaction of the judgment into whose possession soever the same may have passed.' And section 39 of the same act, declares that ' the officer may seize the same property wherever it may be found, etc., and sell the same,' etc. But *how long* the *levy shall remain a lien* upon the property, the act does not provide. The statute being silent as to this, the duration of the lien must be determined by reference to such analogous principles of law as may be applicable. Our law does not favor the continuation of such liens for an unreasonable time. The lien of a judgment upon real estate is limited to three years. In *State Bank vs. Etter*, 15 *Ark.* 269, an execution issued from Pulaski to the sheriff of Hempstead, was levied on land, and returned without sale, by order of the plaintiff. The defendant died, and his administrator afterwards sold the land. The plaintiff afterwards attempted to enforce the lien of the levy by *ven. ex.*, and this court held, that the plaintiff, having directed the return of the execution without sale after the levy, and taken no steps to revive the judgment, against the administrator, and sued out no process for the satisfaction

of the judgment for two years and a half after the levy, and near fifteen months after the land had been sold by the administrator, the lien of the levy was lost. The court remarked that as to judgments, 'the statute has limited the continuance of the lien, but with regard to execution liens, the statute is silent, and the court must necessarily determine, from delay and other circumstances, whether the lien has been waived or abandoned! Where personal property is levied upon, and, by direction of the plaintiff, the sheriff permits it to remain in possession of the defendant, and returns the levy without a sale, the levy will not continue to be a lien as against intervening rights of other persons, etc. Such lien is regarded as dormant and fraudulent as against other creditors. *Perhaps, upon principle,* where goods are levied on, and delivery bond taken, and returned forfeited at the return term, *and the plaintiff permits the next ensuing term of the court to pass without taking out process to enforce the lien of the levy upon the goods, he might, by such neglect, lose his lien as against any intervening rights of other creditors or purchasers.* But, be this as it may, in this case, the appellants sued out no process for more than five years after the return of the bond forfeited, and then they caused *fi. fas.* to be issued, taking no notice of the levies previously returned."

The result was, that the court held that the lien of the levy upon the slaves was abandoned and lost by the laches of the appellants.

These decisions point to the conclusion, which we think inevitable, that the duration of the lien of a levy upon land, and what interference, neglect and delay of the plaintiff in the enforcement of the lien, will displace it, and let in intervening rights of other creditors, etc., must be determined by common law principles applicable to liens of levies upon goods, with such modifications of the principles as must necessarily be made on account of the difference in the nature of the two species of property.

It is not necessary, in this case, for us to attempt to deduce, from the authorities which we have examined, any general and

fixed rule, to be applied in all cases, as to what delay of the execution creditor to sue out process to. enforce a levy upon land by a sale, will displace the lien, and let in intervening incumbrances. It is sufficient to decide upon the facts of the case before us, whether the continuity of the lien was broken by the laches of the plaintiff in the execution.

Here, as above shown, three years and about eight months elapsed between the return of the execution under which the lands were levied on, and the suing out and placing in the hands of the marshal the *vend. ex.* under which they were sold to Fowler, during all which time no step was taken to enforce the levy, which was lying dormant in the clerk's office, and no excuse is given in the original bill for such delay. In the meantime, the judgment, under which Patterson purchased, was recovered, a *fi. fa.* issued, and levied on the lands.

We have found no adjudication, and know of no elementary principle of the common law, to support the lien of a dormant levy for so long a period, as against the intervening rights of a more diligent creditor. On the contrary, the authorities sustain the conclusion that the lien is displaced by such delay. *Hood et al. vs. Winsall*, 1 *B. Mon.* 210; *Owens vs. Patterson*, 6 *Ib.* 490; *Eldridge vs. Chambers*, 8 *Ib.* 413; *Wood vs. Gray et al.*, 5 *Ala.* 47; *Riggin vs. Milligan*, 4 *Gilman* 50; *Presnell vs. Lander*, 5 *Ire. Eq.* 255; *Harding vs. Spivey*, 8 *Ire. L.* 66; *Spencer vs. Hawkins*, 4 *Ire. Eq.* 291.

To uphold the lien of a dormant levy, for so long a time, as against intervening liens, would be to give it greater duration and tenacity than the legislature have deemed expedient, on grounds of public policy, to give the lien of solemn judgments of the courts, which is expressly limited to three years.

The conclusion is that the title of Fowler, as set up in the original bill, is inferior to that of Patterson.

2. We are next to decide whether the court below erred in permitting Fowler to file an amendment to the original bill, after the cause was at issue and set for hearing, setting up

another and distinct title, to the lands in controversy, than that relied on, and sought to be confirmed by the original bill?

The original bill was filed on the 15th June, 1848. The cause, after various and extended pleadings, which need not be particularly noticed, was finally brought to issue, on the original and cross-bills, at the December term 1855, and set down for hearing at the next term. At the next term no step appears to have been taken in the cause. At the ensuing term (on the 12th December, 1856) the following order was made:

"Comes the said complainant, and, on leave of the court, filed his amended bill in this cause, and certain exhibits accompanying the same. And on motion of said complainant, it is ordered that such of said defendants as have appeared to this suit, have leave to answer the matter set up in the amended bill, within two months from this date, and if they, or any of them, should fail to file such answer, within such time, the amended bill shall stand as confessed, and, at the next term, shall be formally taken and entered as confessed against such of said defendants as so fail to answer, within said period of two months; and it is agreed by the complainant, that such answers may be filed without 'being sworn to, and on any of said answers being filed within such period, then, at the end of said period of two months, the cause, as to said amended bill, shall be considered as standing at issue, and the clerk of the court is now directed, on motion of complainant, as soon as said term of two months shall expire, to enter in his name on the records, as by consent, a general replication to each or all of the answers that may be so filed, and on motion of said complainant, this cause is now set down for hearing at the next term, waiving any and all errors or irregularities in the setting down the same before issues are made, or answers in, to said amended bill, cross-bill, answers, exhibits and replications. And it is ordered that each of said parties have leave to take the depositions of witnesses, to be read as evidence on such final hearing. Ordered that this case stands continued until next term."

The amended bill, after reciting the previous pleadings and

proceedings in the cause, alleges, in substance, as follows:

That on the 8th of May, 1843, after the return of the *fi. fa.,* of 4tn February, 1843, which was levied on the lands in controversy, as stated in the original bill, Stewart sued out another *fi. fa.* upon the judgment against Stone, returnable to the October term following, upon which the clerk endorsed the levy upon the lands made under and returned upon the *fi. fa.* of 4th February, 1843, and which was placed in the hands of Thomas W. Newton, marshal, 9th May, 1843, who levied it on the lands in controversy, and other lands; that Stone claimed the benefit of the appraisement act, the lands were offered for sale, and failing to bring two thirds of their appraised value, the marshal returned the *fi. fa.* without sale.

That on the 24th October, 1844, and after the expiration of the twelve months stay allowed by the appraisement act, a *ven. ex.* was sued out, reciting the previous levy, appraisement, etc., and commanding the marshal to sell the lands, etc., returnable first Monday of May, 1845, which was returned 10th March, 1845, without sale, etc.

That on the 10th March, 1845, another *vend. ex.* was sued out, for the sale of the lands levied on and appraised as aforesaid, returnable first Monday of August, 1845, which, on the 19th June, 1845, was returned without sale.

That on the 24th June, 1845, or about that time, another writ of *vend. ex.* was sued out, reciting the levy made and returned upon the *fi. fa. of 4th February,* 1843, as stated in the original bill, and other matters proper for such a writ to recite, which, on the next day, was delivered to Henry M. Rector, marshal, etc., who, on the 5th July, 1845, duly advertised said lands for sale, and pursuant thereto, at the court-house door of Jackson county, on the 16th of August, 1845, sold said lands to Absalom Fowler; that the amounts bid by Fowler were paid to the marshal, and by him applied to the payment of said *ven. ex.* and judgment; all which was to be made apparent by exhibit H, a copy of said execution and return, when it could be found, the original having been lost or mislaid, or if not found, the

amended bill prayed to supply its loss by the best evidence obtainable.

And that the greater part of the facts relative to such last mentioned *ven. ex.*, advertisement, sale, and application of sale's proceeds, would appear by certificate of the deputy who made the sale, which was to authorize a deed, and while the deputy was officially holding the execution, and before the appointment of a successor to Henry M. Rector, marshal, which certificate was brought into court, and a copy filed as exhibit I.

And that said Rector, not long after said certificate was given, and before Fowler was able to obtain a deed to said lands, was finally removed from the office of marshal, and Fowler had no deed, but when he could obtain one, would bring it into court and file a copy as exhibit K.

He claims the benefit of the sale, and title thus purchased, and prays as in the original bill.

No excuse is made in the amendment for not setting up this title in the original bill, or for offering the amendment at so late a period in the progress of the cause.

A copy of the *ven. ex.* under which the sale set up in the amended bill is alleged to have been made, was not filed, or produced at the hearing.

The deed of John Quindley, marshal, bearing date 5th May' 1857, executed under an order of the circuit court of the United States, for the Eastern District of Arkansas, made upon the petition of Fowler, was filed as exhibit K, at the June term 1857.

Patterson did not answer the amended bill within two months after the making of the order copied above, as therein required; but at the June term, 1857, the court gave him leave to file an answer by the next term. He accordingly answered, and in in his answer, objected, by way of demurrer, to the matter of the amended bill.

It will be observed that the amended bill was filed not only after the cause was at issue, but after the parties had been litigating the title set up in the original bill for more than eight years;

and it is manifest that the matter set up in the amended bill was within the knowledge of Fowler, at the time the original bill was filed, for he was the purchaser at both of the alleged sales.

There is some confusion in the English books in regard to the rule as to the time of allowing amendments, and the extent to which they may go, etc.

In *Shields vs. Barrow*, 17 *How. U. S. R.* 144, the court said: " The complainant is not at liberty to abandon the entire case made by his bill, and make a new and different case by way of amendment. We apprehend that the true rule on this subject is laid down by the Vice Chancellor, in *Verplank vs. The Mercantile Ins. Co.*, 1 *Edwards Ch. R.* 46. Under the privilege of amending, a party is not to be permitted to make a new bill. Amendments can only be allowed when the bill is found defective in parties, in its prayer for relief, or in the omission or mistake of some fact or circumstance connected with the substance of the case, but not forming the substance itself, or for putting in issue new matter to meet allegations in the answer. See, also, the authorities there referred to, and *Story's Eq. Pl.* 884.

" We think sound reason can be given for not allowing the rules for the practice of the circuit courts, respecting amendments, to be extended beyond this; though doubtless much liberality should be shown in acting within it, taking care always to protect the opposite party. See *Mavor vs. Dry*, 2 *Sim. & Stu.* 113.

" To strike out the entire substance and prayer of a bill, and insert a new case by way of amendment, leaves the record unnecessarily encumbered with the original pleadings, increases expenses, and complicates the suit; it is far better to require the complainant to begin anew.

" To insert a wholly different case is not, properly, an amendment, and should not be considered within the rules on that subject.

See, also, the remarks of the Lord Chancellor COTTENHAM, in

*Watts vs. Hyde*, 22 *Eng. Ch. R.* 407, on the subject of amendments.

In *Vernon vs. Vernon*, 14 *Eng. Ch. R.* 172, it was held that a statement in the bill that complainant was tenant in tail by way of purchase, and also, that he was heir apparent in tail, were such inconsistencies as could not stand together in one bill, and leave to amend by striking out was granted, only because the Lord Chancellor was led to believe that some of the allegations had crept into the bill by accident.

In *Fenno vs. Coulter*, 14 *Ark. R.* 45, after reversing the decree, on the case made by the bill, the court said: "In remanding the cause, a question of practice arises in regard to instructions to be given to the court below, etc. Shall we allow the complainant to amend his bill, etc., or shall we direct that the suit be dismissed without prejudice, etc. We have, in several instances, pursued the latter course, and as the facts of the case are materially different from those heretofore presented, we have again looked into the authorities, and upon examination of the cases, which we have heretofore decided, we find, in each of them, an amendment would, in effect, have been the institution of a new suit, upon a distinct and independent claim or right. For instance, in *Cook vs. Bronaugh*, 8 *Eng. R.* 188, the bill was for specific execution of a contract, but it appeared that he (Cook) might have asserted a claim for the professional services, which were the consideration on which the special contract was based. The court refused to send the case back to the court below, with leave to amend, because it would have been no amendment of a cause of action defectively stated, but the substitution of a new and different cause of action. And so, also, in the case of *Maulding vs. Scott et al.* 8 *Eng.* 93. The bill set up title in the complainants to slaves, as heirs of the mother, who, it appeared upon the trial, had no title, but that the complainants had title as heirs of the father. The court refused to direct an amendment, because it would not be an amendment of a case defectively stated, but the statement of a new and independent title."

In the case now before us, the title set up in the amended bill was not only new and distinct from that alleged and relied on in the original bill, but the titles were contradictory, and both could not stand, or be upheld by a decree.  Because the title set up in the amended bill was a sale of the lands by the marshal, under process issued against Stone, on the 16th of August, 1845, while the title set up in the original bill was a sale of the same lands, under process upon the same judgment, against the same person, on the 25th January, 1847, and of course, if the prior sale was valid, and vested Stone's title in Fowler, he acquired no title whatever by the subsequent sale.

That both titles might have been set up in the original bill, with an alternative prayer for the confirmation of the one or the other, according to the judgment of the court as to their regularity, and validity, we do not doubt.  Nor would we say that the title set up by the amended bill might not have been brought into the case by amendment, if the amendment had been offered at a proper, and within a reasonable time in the progress of the cause.  But to allow a new case to be made by an amended bill after the parties had been litigating for more than eight years, upon another title, and after the cause was at issue, and set for hearing, would be extending the privilege of amendments beyond what is warranted by the established rules of pleading and practice, and setting a precedent that might result in much mischief.  *Story's Eq. Pl. sec.* 886.

The objection to the matter set up in the amended bill, was well taken by the demurrer contained in the answer.  *Wray vs. Hutchinson,* 7 *Eng. Ch. R.* 237.

The conclusion which we have reached, renders it unnecessary to pass upon the regularity and validity of the execution sale, etc., set up in the amended bill, or to decide other questions discussed by counsel.

The decree of the court below in favor of Fowler, must be reversed, and the cause remanded with instructions to dismiss the bill without prejudice to the right of his representatives (he

having died pending this appeal,) to file a new bill, if they think proper to do so.

Mr. Justice FAIRCHILD did not sit in this case.